# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 29, 2014

## STATE OF TENNESSEE v. GLENN LEMUAL STEPP

**Direct Appeal from the Circuit Court for Jefferson County**
**No. 11442      O. Duane Slone, Judge**

---

**No. E2013-01291-CCA-R3-CD-FILED-MARCH 17, 2014**

---

A Jefferson County Circuit Court Jury found the appellant, Glenn Lemual Stepp, guilty of attempted first degree murder, a Class A felony, and in violation of an order of protection, a Class A misdemeanor. The trial court imposed a total effective sentence of twenty-five years, eleven months, and twenty-nine days. On appeal, the appellant challenges the sufficiency of the evidence sustaining his attempted first degree murder conviction, contending that the State failed to prove premeditation. The appellant also complains about the twenty-five-year sentence imposed by the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JEFFREY S. BIVINS, JJ., joined.

P. Richard Talley, Dandridge, Tennessee, for the appellant, Glenn Lemual Stepp.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; James B. Dunn, District Attorney General; and Jeremy Ball, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

A Jefferson County Grand Jury returned a multi-count indictment against the appellant, charging him with attempted first degree murder, three counts of aggravated assault, and violating an order of protection. All of the offenses related to the appellant's

stabbing of his wife, Pamela Stepp.

At trial, the victim testified that in May 2011, she was married to the appellant, and they had three children together. They had separated and reconciled on multiple occasions. The victim obtained an order of protection against the appellant in December 2010, which was still in effect in May 2011. The victim said that she and the appellant separated in August 2010. Thereafter, she met a man online and went with him to another state for a week around Thanksgiving. While she was gone, the appellant learned of the trip and changed the locks on her house. When she returned, he told her that she was "stupid" for having a liaison with another man, and the victim agreed.

The victim said that in April 2011, although their marriage had been troubled for "years," she allowed the appellant to briefly stay at her residence while he was working a temporary job. She and the appellant did not share a bedroom and were not intimate during his stay. The victim said that she and the appellant had agreed to divorce and that she "was trying to be cordial so we could get the paperwork done." The victim did not have any interactions with another man during the time the appellant was living with her.

The victim said that on May 12, 2011, she told the appellant to leave because his job was finished. During their conversation, the appellant asked if she planned to sell the waterbed. When she responded affirmatively, the appellant asked her to name a price. The victim described the conversation as "sharp" but not "heated." She ultimately decided to allow the appellant to have the bed for free. To encourage the appellant's departure, she emptied the contents of the chest of drawers, the dresser, and the nightstand that went with the bed. She told the appellant that she had removed her belongings from the furniture, that he could take those four pieces, and that he needed to leave. Nevertheless, she knew the appellant would not take the bed that night as it would take hours to drain, and he would need a truck to haul the furniture. The victim described their attitudes toward each other as "cool" but "cordial." The victim said that she and the appellant did not talk about her relationship with another man.

Afterward, the victim went into the living room, sat on the couch, and began crocheting a baby blanket. The appellant went outside on the porch because the victim did not allow him to drink or smoke in the house. Five to ten minutes later, at around 9:00 or 9:30 p.m., the appellant walked up behind the victim and whispered in her ear, "'Remember when I told you you weren't going to kick me around like a soccer ball anymore?'" The victim turned to respond, and the appellant began stabbing her.

The victim recalled that the first stab "hit like the wire in my bra" and that it "went all the way in." When the appellant pulled the knife from her body, blood poured from the

wound. The second stab pierced the victim's abdomen, puncturing her kidney. The victim felt the appellant pull the knife upward, and she grabbed his wrist with both of her hands. She pushed his hands back, and he cut her upper right arm. The appellant stabbed each of her breasts then her wrist. She said that when he cut her wrist, the tendons were "hanging out like two pieces of spaghetti." The victim did not remember whether the appellant spoke to her during the attack. She repeatedly told the appellant "'no,' 'stop,' and 'don't.'" She said that the appellant appeared "very angry."

The victim said that after the appellant cut her wrist, he stopped stabbing her and started to walk around the couch. The victim grabbed her cellular telephone with her uninjured hand, ran toward the front door, and tried to unlock the door with her wounded hand. The appellant approached from behind her and slapped the cellular telephone from her hand. The victim opened the door and ran across the street to the apartment of her neighbor, Mike Potts. By the time she reached the apartment, she was "soaked" with blood. Potts called 911 to report the stabbing, and he told the 911 operator that the appellant was standing beside a tree across the road. The appellant never came to Potts's residence to check on the victim.

The victim said that medical personnel arrived and began treating her. She was flown by LifeStar helicopter to the University of Tennessee Medical Center, where she was hospitalized for twelve days. Among her wounds were cuts and punctures to her diaphragm, lung, liver, little finger, thumb, and left wrist. The victim said that "both breasts had to be sewn up." Additionally, a surgeon had to reconstruct the tendons in her left hand. As a result of "massive scar tissue" in her hand, she was no longer able to bend her wrist.

On cross-examination, the victim said that she was married to the appellant for thirty years but that they were divorced. She had not spoken to the appellant since the stabbing. That day, the victim got home from work around 4:00 or 4:30 p.m. The appellant was on the porch, smoking and drinking alcohol. They did not speak much. She sat on the couch, watching television and crocheting; the appellant stayed on the porch, occasionally coming inside for another drink. The victim did not know what the appellant was drinking but believed it was vodka and orange juice. She said the appellant drank "[q]uite a bit."

The victim said that she and the appellant "did not have heated arguments" about her relationship with another man and that it "was a dead subject at that time. . . . We were not arguing about a man or men."

The victim acknowledged that after she was stabbed, she learned that the appellant had told their son Austin that he "was going to kill [the victim] and any boyfriend [she] brought to the house." The threat occurred a week or two before she was stabbed, but Austin

did not tell the victim earlier "[b]ecause he didn't think that [the appellant] would do anything."

The victim said that the man she met online was named Greg. Although the appellant told Sergeant Bowen about "some fellow from over in Savannah, Georgia, and another fellow named Clint," the victim did not know to whom the appellant was referring. The victim stated that during the appellant's stay at her house, she never led him to believe they were resuming their relationship, reiterating that they had agreed to a divorce. She said that on the night of the stabbing, the appellant was upset about the price of the bed but was not upset about anything else. The victim did not threaten to call the police and report that the appellant was violating the order of protection. She stated that the problems in her marriage resulted from the appellant's alcoholism, not other men. She said that she and the appellant were separated in November 2010 when she had a relationship with the man she met online.

On redirect examination, the victim said that the appellant was a "functioning alcoholic." She recalled that on the night of the stabbing, the appellant had been drinking, but he was able to have a coherent conversation.

On recross-examination, the victim said that she did not find it abnormal that the appellant drank for hours that day, noting that he drank heavily on daily basis for years.

The State played for the jury an audio recording of the appellant's 911 call reporting the stabbing. During the call, the appellant told the 911 operator that he had just killed his wife with a knife. The appellant told the operator to send someone to arrest him. The operator asked if the victim was breathing, and the appellant answered that he did not know. When the operator asked him to verify whether the victim was breathing, the appellant responded, "Just send somebody." The operator again asked him to check to see if the victim was breathing, and the appellant said, "No." When the operator asked the appellant why he killed his wife, he responded, "She's a bitch. And I just killed her."

Additionally, the State played an audio recording of Potts's 911 call. Potts told the 911 operator that the victim was at his residence, that the victim's abdomen was "bleeding like crazy," and that she said she had been stabbed. Potts asked the victim who stabbed her, and she responded that her husband, the appellant, was the assailant. Potts said that the appellant was standing in the front yard across the street.

Sergeant Monte Bowen testified that at 9:29 p.m. on May 12, 2011, the Jefferson County Sheriff's Office received a call regarding the stabbing of a female at 1563 Harold Patterson Road. While Sergeant Bowen was on his way to the scene, he received a report that the victim was inside Potts's residence at 1564 Harold Patterson Road. As Sergeant

-4-

Bowen approached the scene, he shut off his emergency equipment, believing the suspect was still in the area.

Sergeant Bowen parked, exited his vehicle, and walked toward the victim's residence. Along the way, he encountered the appellant standing by the front of his vehicle in the driveway. The appellant was smoking a cigarette, and he was covered in blood. He did not appear upset and acted as if nothing were wrong; he was coherent, "very mellowed out," and cooperative. Additionally, the appellant did not appear to be intoxicated. Sergeant Bowen drew his gun, pointed it at the appellant, and asked for the victim's whereabouts. The appellant responded, "'I don't know, I hope I killed the bitch.'" Sergeant Bowen handcuffed the appellant, escorted him to Sergeant Bowen's patrol car, patted him down, and put him in the back of the car. Sergeant Bowen assigned a deputy to watch the appellant then went to Potts's residence in search of the victim.

Sergeant Bowen said that when he went inside Potts's residence, he saw a lot of blood. The victim was lying in the floor with her head on a pillow. Potts was putting pressure on the victim's wounds. Sergeant Bowen thought the victim was going to die and asked who stabbed her. The victim identified her husband, the appellant, as the assailant.

Sergeant Bowen said that a trail of blood was on the sidewalk and grass between Potts's residence and the victim's residence. Inside the victim's residence, blood was smeared on the wall beside the front door, and a lot of blood was on the walls and the couch. The curtains and a table and lamp beside the couch were spattered with blood. The kitchen sink contained "watered down blood," which Sergeant Bowen opined was likely from the appellant's washing his hands after the stabbing.

Sergeant Bowen said that when he returned to his patrol car, the appellant asked to speak with another officer, Keith Bunch. Thereafter, Sergeant Bowen saw the appellant at the criminal justice center. Sergeant Bowen advised the appellant of his Miranda rights, which the appellant waived, and the appellant gave the following statement:

> "[The victim] met Gregg Murphy in November in Savannah, Georgia, which started our problems. Then I forgave her for doing this. Then she met another guy named Clint on the internet. All this has been bottled up on me, and tonight she was on the couch. I came in. I told her I wasn't going to be kicked around anymore. I stabbed her. She told me that she was going to see . . . Kim in Charleston, North Carolina, but she went to see him. She was sitting on the couch. I came in behind her with a hunting knife. I started stabbing her. I was telling her I

wasn't going to be kicked around, and then I don't remember anything but her running out going to the neighbor's. I can't remember where I put the knife. I have loved her for a lot of years. I wish now I would not have stabbed her. She got an order of protection on me for no reason. I don't know what happened to me or why I did stab her."

Sergeant Bowen said that when he asked the appellant to disclose the location of the knife, the appellant said that the police "would never find it." The police found the sheath for the knife on the front porch.

Sergeant Bowen said that the appellant never asked about the victim's well-being. Instead, the appellant "seemed pretty much at peace with what he done in my opinion."

On cross-examination, Sergeant Bowen said that the appellant talked to Detective Curtis Owens at the scene and that the appellant later gave a statement to Sergeant Bowen. On the night of the offense, Sergeant Bowen did not smell alcohol on the appellant. He said that Detective Owens, who was closer to the appellant, smelled alcohol on him.

Deputy Keith Bunch testified that on May 12, 2011, he was employed by the Jefferson County Sheriff's Department[1] and that he was dispatched to Harold Patterson Road. By the time he arrived at the scene, Sergeant Bowen had taken the appellant into custody. Sergeant Bowen told Deputy Bunch that the appellant was willing to speak with Deputy Bunch. When Deputy Bunch asked the appellant what happened, the appellant said "that his wife was cheating on him, he became furious, stabbed her with a knife." The appellant was upset and repeatedly referred to the victim as a "bitch." He did not appear concerned about the victim's well-being. When the ambulance left with the victim, the appellant asked if she was dead and stated, "I hope the bitch dies." Deputy Bunch asked the appellant to disclose the location of the knife used in the stabbing, and the appellant responded, "'You'll never find it.'" The appellant was coherent, appeared to understand the conversation, and did not appear to be intoxicated.

Deputy Bunch said that he saw the victim lying on Potts's floor before she was taken from the scene. She was covered in blood and appeared to be seriously injured, possibly dying. Therefore, as the paramedics were loading the victim into the ambulance, Deputy Bunch asked her to identify the person who stabbed her. The victim said that her husband, the appellant, was the assailant.

_____

[1]At the time of trial, Deputy Bunch was an officer with the Jefferson City Police Department.

Deputy Bunch said that when the appellant was taken to the jail for booking, he had blood on his clothing and his skin. Additionally, the appellant had some wounds on his hand.

On cross-examination, Deputy Bunch said that he prepared a report in which he recorded the statement the appellant made on the night of the shooting. The report reflected that the appellant said:

> "[H]e and his wife had been arguing about an alleged marital affair that [the victim] was involved in. [The appellant] stated that he became furious and went into the kitchen to get a knife. [The appellant] stated that he stabbed his wife with the knife."

Chris Stepp, the appellant and the victim's son, testified that on May 12, 2011, he was at the house at 1563 Harold Patterson Road. He said that he and the appellant had looked at the walls and talked about paint and sheetrock. They had a normal conversation, and nothing appeared to be out of the ordinary. The appellant seemed coherent. At approximately 6:00 p.m., Chris left for work. Around 11:00 or 11:30 that night, Chris's sister called and told him to meet her at the hospital because their mother had been stabbed.

Chris said that the next morning, he and his wife left the hospital and went to the victim's house to assess the damage and clean. In a trash can beside the garage door in the basement, Chris found a knife. He reported the discovery to the police, and they came to the residence and retrieved the knife.

On cross-examination, Chris said that the appellant had been staying with the victim for approximately one month. Since the stabbing, Chris had not spoken with the appellant. When asked if he had any issues with the appellant, Chris said yes. He explained that when he was eighteen, the appellant attacked him, and he defended himself. Chris said the appellant was a "[b]ad father" and "taught me everything what not to do." He said that the appellant had a drinking problem.

On redirect examination, Chris said that he had seen the appellant on occasions when he was too intoxicated to be coherent. He said that on the day of the stabbing, the appellant did not appear to be "too drunk to function."

Austin Stepp testified that approximately two to four weeks before the stabbing, the appellant said that he would "kill [the victim] and any man that she brings home." Austin tried to dissuade him, but the appellant appeared set on his course of action. Austin did not warn the victim because he did not believe the appellant was serious.

On cross-examination, Austin said that he told the victim about the threat one or two months after she came home from the hospital. The victim advised him to tell the police.

Austin said that before the stabbing, the appellant and the victim had difficulties in their marriage and were close to divorcing. The victim allowed the appellant to stay with her temporarily because she pitied him. The appellant knew about the victim's affair because Austin had shown him emails the victim had sent to Greg, the man she was dating. One morning within a month before the stabbing, Austin and the appellant were in the victim's kitchen, talking about how the victim had "moved on." Austin told the appellant that he needed to also "move on," but the appellant was not ready for the relationship to end. Austin said that the victim had gone to another state to visit Greg and that the appellant "was making the threat that if she brought anyone back to the house where we currently live, that he would do something about it." Defense counsel asked if the appellant "was greatly torn and emotionally disturbed because of what was going on." Austin responded, "You could say that, but . . . [a]lthough he might feel torn and ashamed of what he's done, it's still his fault."

Jefferson County Sheriff's Detective Curtis Owens testified that he responded to the scene of the stabbing. The appellant was in custody in the back of a patrol car. Because it was very hot and the appellant was sweating, Detective Owens got the appellant out of the car.

The appellant told Detective Owens that he had stabbed the victim and that "he hoped the bitch was dead." The appellant gave the following reason for the stabbing:

> [The victim] had gotten on-line and met a gentleman on the internet or something, began having sex with him and in fact, moved in with him, and that sometime down the road he wanted to keep her because they had been married for 29 years and she had [come] back to the house and stayed awhile and then started engaging in the same thing again over the internet.

Initially, the appellant said that he stabbed the victim with his fingers. Detective Owens told the appellant that he doubted the appellant's story, explaining that he had found a knife holster on a chair on the porch. The appellant then acknowledged that he stabbed the victim with the knife that had been in the sheath. The appellant said that he had gotten rid of the knife "in a fit of rage" and that he did not know where it was. Additionally, the appellant said that he had backed his car out of the garage to leave but changed his mind and waited for the police, believing he would have been caught. Detective Owens smelled alcohol on the appellant, but the appellant was coherent.

Detective Owens said that the next day, the appellant's son Chris informed the police that he had found a knife in a garbage can in the victim's basement. Detective Owens went to the victim's house and retrieved the knife. Detective Owens believed the knife had been washed, noting that droplets of water were on the blade.

On cross-examination, Detective Owens said that he first spoke with the appellant approximately one and one-half hours after the stabbing. The appellant said that the victim had become involved with a man she met on the internet, that the appellant and the victim reconciled, and that the victim then became involved with another man she met on the internet. The appellant did not say they were arguing before the stabbing but said they were discussing the victim's affair. The appellant was cooperative with Detective Owens.

James Michael Potts testified that the victim lived directly across the street from him. Around 9:00 p.m. on May 12, 2011, Potts was in bed and heard someone beating on his front door. When he answered the door, he saw the victim outside, covered in blood "from the upper chest down." The victim said that she had been stabbed and asked Potts to call 911. The victim came inside, and Potts made her lie down on the floor. As they waited for an ambulance to arrive, the victim appeared to be "fading away," her coloring turned ashen, and a growing puddle of blood formed around her. Potts looked out his screen door and saw the appellant standing approximately thirty yards away in the victim's front yard, smoking a cigarette. The appellant never checked on the victim's well-being.

The State rested its case, and the appellant elected not to testify or put on proof. During closing argument, the defense did not dispute that the appellant stabbed the victim; however, counsel argued that the appellant did not act with premeditation but instead acted in a state of passion.

The jury found the appellant guilty of the charged offenses. At the sentencing hearing, the trial court merged the three aggravated assault convictions into the attempted first degree murder conviction. Thereafter, the court imposed a sentence of twenty-five years for the attempted murder conviction and eleven months and twenty-nine days for the violation of the order of protection conviction. The court further ordered the sentences to be served consecutively. On appeal, the appellant challenges the sufficiency of the evidence sustaining his attempted first degree murder conviction and the twenty-five-year sentence imposed by the trial court.[2]

## II. Analysis

---

[2]On appeal, the appellant raises no challenges to his conviction of violating an order of protection or the accompanying sentence.

## A. Sufficiency of the Evidence

First, we will address the appellant's challenge to the sufficiency of the evidence sustaining his conviction of attempted first degree murder. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and

the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).  First degree premeditated murder is defined as the "premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1).

Premeditation involves "an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself."  Tenn. Code Ann. § 39-13-202(d).  However, "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time."  Id.  "Premeditation may be proved by circumstantial evidence."  State v. Brooks, 249 S.W.3d 323, 329 (Tenn. 2008).  "Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'"  State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting Tenn. Code Ann. § 39-13-202(d)).  Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself.  [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time."  Tenn. Code Ann. § 39-13-202(d).  Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation.  See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998).  Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing.  See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In the light most favorable to the State, the proof adduced at trial reveals that the victim and the appellant were married for almost thirty years but that their relationship was ending, and they had agreed to divorce.  Although an order of protection had been issued against the appellant, the victim allowed him to briefly stay with her for the duration of a temporary job.  On the day of the offense, the victim told the appellant that he had to move out of her house because his job was finished.  They debated over the price of some bedroom furniture, and the victim eventually capitulated and agreed to let the appellant have the furniture for free.  After the discussion the victim went into the living room to crochet, and the appellant went outside on the porch to smoke and drink.  After some time, the appellant came up behind the unarmed victim, who was sitting on the sofa.  He told her that she would

-11-

not "kick [him] around" anymore and repeatedly stabbed her with a large knife. Although the victim was wounded grievously and bleeding profusely, she ran to a neighbor's house for assistance. The neighbor called 911. When the police arrived, the appellant was calmly smoking a cigarette outside the victim's house.

After the stabbing, the appellant did nothing to indicate concern for the victim's well-being; instead, he told several officers that he had stabbed the "bitch" and that he hoped she died. He complained that she had been having extra-marital affairs. The appellant told the police that they would never find the knife. When police went into the victim's house, they found bloody water in the sink, indicating that someone had washed up in the kitchen. The victim was transported by LifeStar to the hospital, where she remained for twelve days. The victim suffered cuts and punctures to her diaphragm, lung, liver, finger, thumb, left wrist, and both breasts. She suffered extensive scarring and permanent disability to her left hand. Two to four weeks prior to the stabbing, the appellant, upset by the victim's infidelity, threatened to kill the victim and any man she brought home. The day after the stabbing, the victim's other son, Chris, found a large knife in the victim's basement trash can; the knife appeared to have been washed.

On appeal, the appellant does not deny stabbing the victim. However, he contends that he did not act with premeditation. He acknowledges that the State's argument at trial was that premeditation was established by the appellant's use of a weapon on an unarmed victim, his previous threats to kill the victim, his stabbing the victim multiple times, his washing and concealing the knife, his calm appearance after the offense, and his failure to render aid to the victim. Nevertheless, he argues that he acted in a state of passion and under provocation because of the victim's marital infidelity. However, the jury heard the proof and rejected that defense theory. Whether a defendant acted under adequate provocation is a jury question, and this court will defer to the finder of fact's evaluation of the evidence and its determination regarding the existence of adequate provocation. State v. Williams, 38 S.W.3d 532, 538 (Tenn. 2001); State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). Moreover, the jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). In the instant case, there is no reason to second-guess the jury's decision because the evidence is sufficient to support the verdict.

B. Sentencing

As his final issue, the appellant challenges the trial court's imposition of a twenty-five-year sentence for his attempted first degree murder conviction. Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Additionally, our supreme court has held "that the appropriate standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." State v. James Allen Pollard, __ S.W.3d __, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *7 (Tenn. at Nashville, Dec. 20, 2013). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

-13-

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

At the sentencing hearing, the State introduced the appellant's presentence report, which included the victim's impact statement. The State acknowledged that the appellant had a minimal criminal record. Nevertheless, the State argued that multiple enhancement factors were applicable, namely (5) the appellant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense; (6) the personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great; (9) the appellant possessed or employed a deadly weapon during the commission of the offense; and (14) the appellant abused a position of private trust in a manner that significantly facilitated the commission or the fulfillment of the offense. The State insisted that due to the egregious nature of the offense, the appellant deserved the maximum possible sentence, which was twenty-five years.

Defense counsel contended that the appellant showed remorse after the stabbing.

Charlton Stanley, a forensic psychologist, testified that he performed a psychological evaluation of the appellant. The appellant reported coming "from a broken home." His father was not around and may have had mental health problems. Dr. Stanley said that the appellant "said his childhood was happy but then he turns around and tells me that he was a loner and didn't have any friends, so that was a little contradictory but not unusual. People tend to gloss over the unhappy stuff." When the appellant was older, his brother, who suffered from mental problems, committed suicide.

The appellant told Dr. Stanley that he had five siblings, four of whom were still living, and that his parents were deceased. The appellant graduated from high school and obtained an associate's degree in business administration. He had "worked numerous jobs as an

electrician in the construction industry and job instability is normal in the construction industry." The appellant last obtained a paycheck in 2002, at which point he was injured at work and began receiving social security disability checks. He was in the Air Force for four years and was honorably discharged. His first marriage lasted nine years and produced a son. When the appellant was thirty-six years old, he married the victim. At the time of the offense, the appellant and the victim had been married approximately twenty-eight years and had three children; however, they were divorced by the time of the sentencing hearing.

Dr. Stanley said that the appellant had a "lifelong problem" with alcohol. Although the appellant underwent a thirty-day treatment program, the appellant did not think it helped. The appellant acknowledged experimenting with marijuana but denied using it on a regular basis. He also denied having hallucinations after consuming alcohol but conceded he had "alcohol-related blackouts."

Dr. Stanley said that when he asked about the offense, the appellant began crying. He said that he was sorry he hurt the victim and regretted upsetting his children. The appellant noted that the children he had with the victim no longer had contact with him.

Dr. Stanley said that during the examination, the appellant was "oriented" and "knew time, place, person, and purpose." Dr. Stanley opined that the appellant "is capable of thinking abstractly and not just concretely." The appellant "gets along with people reasonably well but he's not a social man." The appellant displayed "very poor coping abilities" and was "likely to respond to stress with outbursts, with temper, almost to the point of being explosive temper." Additionally, Dr. Stanley noted that alcohol lowered the appellant's inhibitions. The appellant also had long term issues with depression and anxiety.

On cross-examination, Dr. Stanley said that the appellant was an intelligent person and that he had problems controlling his temper, which was exacerbated by the use of alcohol.

The sixty-seven-year-old appellant testified that he had been honorably discharged from the Air Force in 1968. He and the victim were married for twenty-eight years and divorced after the stabbing. The divorce settlement required the appellant to pay the victim $750 per month "for the injuries she suffered." The appellant asserted that "a lot of different things" led up to the stabbing, contending that "the infidelity is really what started it, I guess, and it just snowballed."

The appellant said he was sorry for hurting the victim and wanted to express his remorse to his family. He asked the court to "[b]e fair." He acknowledged that he had made a mistake and that he was willing to pay for his mistake.

-15-

On cross-examination, the appellant conceded that he told the 911 operator that he was not going to check on the victim but explained that he could not check on her because she was in a neighbor's house. He did not recall telling the first responders that he hoped the victim died. When asked if he knew the victim had an order of protection against him, he responded, "That was news to me." He said that he moved in with the victim in January and that they were sleeping together. In February, a man named Clint called the victim, and she met him in Gatlinburg. The appellant then left the victim's residence for a couple of weeks. She called and told him about "all these problems she's having." The appellant offered to come over and "fix things" for her.

At the conclusion of the proof, the trial court stated:

> The Court was the same Court that heard the proof during the trial of this case and of course rel[ies] on all of that evidence. The Court finds the following enhancement factors. The Court does find that this victim did sustain great personal injuries. She does have a permanent disability because of the defense wounds to her wrist. The injuries were injuries to her diaphragm, her lung, her liver were punctured requiring reparative surgery, left wrist tendons which control the middle and ring finders were sliced and they have a permanent lump of scar tissue which limits the flexion of the wrist. Her stomach, breast, forearm, and ribs are scar[r]ed and required sixty-five to seventy stitches. According to the victim impact statement, the scar tissue on her stomach tightens and it's painful. This victim was flown by Lifestar to the UT Medical Center where she spent twelve days on the trauma care floor. The first three days, she couldn't even talk due to the injury to her lung and was in an extraordinary amount of pain.
>
> Psychological effects. Now she sleeps with her bedroom locked, and all the doors in the house, and has nightmares that this [appellant] is hiding in the house or is trying to get into the house. She has to sit in the corner wherever – in any room where she can see everyone that enters the room. She cannot watch crime television shows. Finds no humor in I-could-kill statements meant in jest. People around her, she knows, have to walk on eggshells so as not to frighten her with their actions and their words, that she has to live with.

This [appellant], on a prior occasion, no evidence indicating that he was drunk when he said it, told his son this victim, the mother, that he intended to kill her. He came up from behind her with a big hog knife, it wasn't any sort of small knife, with a long blade. He stabbed her in the chest. He kept stabbing her. She tried to move away from him.

Any mitigating factors. The Court does find this [appellant] does suffer from depression and anxiety. He's addicted to alcohol. I forget the exact term, but avoidance personality disorder.

As a standard, Range I offender, the appellant was subject to a sentence between fifteen to twenty-five years for his conviction of attempted first degree murder, a Class A felony. See Tenn. Code Ann. §§ 39-11-117(a)(2); Tenn. Code Ann. § 40-35-112(a)(1). Considering the enhancement and mitigating factors, the trial court sentenced the appellant to twenty-five years for the attempted first degree murder conviction and to eleven months and twenty-nine days for the Class A misdemeanor conviction for violating an order of protection. See Tenn. Code Ann. § 39-13-113(g). The court ordered the sentences to be served consecutively. Id.

On appeal, the appellant complains the trial court erred by imposing a sentence of twenty-five years. Specifically, the appellant contends that the trial court failed to consider in mitigation that he did not have a criminal history, had a good educational and employment background, had potential for rehabilitation, and felt remorse for the crime. Additionally, he contends that the trial court failed to consider the effect of his alcohol addiction and psychological disorders on his judgment and his intent to violate the law. We note that while a lack of criminal history and good educational and work history may be entitled to consideration, they are not "'statutory' factors" under Tennessee Code Annotated section 40-35-113; "it is left to the sound discretion of the trial court whether to apply the so-called 'catch-all' provision of section 40-35-113(13)." State v. Robert Allen Zaloba, No. M2011-00855-CCA-R3-CD, 2012 WL 6690027, at *25 (Tenn. Crim. App. at Nashville, Dec. 26, 2012), perm. to appeal denied, (Tenn. 2013). These mitigating factors were brought to the attention of the court and were obviously rejected.

Next, we turn to the appellant's contention that the court should have considered his rehabilitative potential, remorse, and the impact of his mental problems and addiction on his ability to form an intent to violate the law. We note that the court observed that the appellant expressed an intent to kill the victim at a time when the appellant was not intoxicated, thereby minimizing any claim that his behavior was entirely fueled by alcohol. Moreover,

while remorse and rehabilitative potential may be considered in mitigation, the record reflects that the trial court accredited the victim's version of events and discounted the appellant's version of events. Further, the proof at trial revealed that the appellant repeatedly stated that he hoped the victim died, which makes his later claim of remorse questionable.

As was noted by the trial court, the appellant repeatedly stabbed the unarmed victim with a large knife, gravely wounding and permanently scarring her. See Tenn. Code Ann. § 40-35-114(6), (9). The court clearly attributed great weight to these enhancement factors. We can discern no abuse of discretion in the sentence imposed by the trial court.

### III. Conclusion

In sum, we conclude that the evidence was sufficient to sustain the appellant's conviction for attempted first degree murder and that the trial court did not abuse its discretion in sentencing. Therefore, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE